# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
June 13, 2001 Session

## EDDIE BROWN LIMBAUGH, Executor of the Estate of EMMA RUTH LIMBAUGH  v.  COFFEE MEDICAL CENTER, ET AL.

**Appeal By Permission from the Court of Appeals, Middle Section**
**Circuit Court for Coffee County**
**No. 28,936     Hon. John W. Rollins, Judge**

---

**No. M1999-01181-SC-R11-CV - Filed October 16, 2001**

---

The plaintiff, originally acting as the conservator for his mother, filed suit against Coffee Medical Center and its employee, nursing assistant Louise Ray, to recover damages for his mother's injuries when she was assaulted by this nursing assistant.  In his complaint, he alleged that the medical center had prior notice of Ms. Ray's propensity for violence and that it negligently failed to take precautionary measures, which proximately caused his mother's injuries.  The Circuit Court for Coffee County, following a bench trial, entered a judgment against Ms. Ray for her assault and battery in the amount of $25,000 and against Coffee Medical Center for its negligence in the amount of $40,000.  The Court of Appeals affirmed the judgment against Ms. Ray, but it reversed the judgment against the medical center after concluding that it was a governmental entity and was therefore immune from suit under Tennessee's Governmental Tort Liability Act (GTLA).  We then granted this appeal to determine the following issues: (1) whether a governmental entity's negligence can provide the basis for liability under the GTLA for injuries arising out of a reasonably foreseeable assault and battery by an employee of that entity; and (2) whether comparative fault principles should apply when the negligent and intentional tortfeasors are both made parties to the suit.  After examining the evidence and applicable law, we conclude that the medical center is not immune from tort liability where the injuries at issue were proximately caused by its negligence in failing to exercise reasonable care to protect a resident from the foreseeable risk of an employee's intentional assault and battery.  Furthermore, we conclude that where the harm arising from the intentional acts of the nursing assistant was a foreseeable risk created by the negligent medical center, and all tortfeasors have been made parties to the suit, each tortfeasor party shall be held jointly and severally liable for the entire amount of damages awarded.  Accordingly, we reverse in part and affirm in part the Court of Appeals and remand the case to the Circuit Court for Coffee County to determine the total amount of damages to be awarded to the plaintiff.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the Court of Appeals Affirmed in Part; Reversed in Part; Case Remanded**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, and ADOLPHO A. BIRCH, JR., JJ., joined. JANICE M. HOLDER, J., filed a concurring opinion.

H. Thomas Parsons, Manchester, Tennessee, for the appellant, Eddie Brown Limbaugh, Executor of the Estate of Emma Ruth Limbaugh.

Michael M. Castellarin, Nashville, Tennessee, for the appellee, Coffee Medical Center.

Louise Ray, Manchester, Tennessee, Pro Se.

John C. Duffy, Knoxville, Tennessee, for the Amicus Curiae, Tennessee Municipal League Risk Management Pool.


**OPINION**

**BACKGROUND**

The events surrounding this case arose on January 19, 1997, when an employee of the Coffee Medical Center's ("CMC") nursing home,[1] nursing assistant Louise Ray, physically assaulted and seriously injured ninety year old Emma Ruth Limbaugh, one of the nursing home's residents. Ms. Limbaugh had been diagnosed with Alzheimer's disease and was predominantly confined to her bed or a wheelchair. As a result of her mental and physical infirmities, she was required to wear restraints for her personal safety and was otherwise completely dependent on her caretakers for all of her personal needs.

Following the attack, Mr. Eddie Brown Limbaugh, Ms. Limbaugh's son, filed suit[2] against nursing assistant Louise Ray for assaulting and injuring his mother. He also filed a complaint against CMC, alleging that CMC had prior notice of Ms. Ray's propensity for violence and therefore had a duty to take reasonable precautions to protect its residents from the foreseeable acts of a violent staff member. Because CMC breached its duty to remove her from direct contact with patients, CMC's negligence proximately caused his mother's injuries.

In support of his allegations against CMC, Mr. Limbaugh introduced at trial the testimony of Jennie Louise Cox, the daughter-in-law of a resident at the nursing home. Ms. Cox testified that

---

[1] The parties have stipulated that Coffee Medical Center Hospital and Coffee Medical Center Nursing Home are one entity under the single name of Coffee Medical Center.

[2] Mr. Limbaugh originally filed this action as the conservator for his mother. While this action was pending, Emma Ruth Limbaugh died. Mr. Limbaugh moved, and was granted permission, to continue the action as the executor of his mother's estate.

she was engaged in an altercation with Ms. Ray just eighteen days prior to the incident involving Ms. Limbaugh. According to Ms. Cox, on the evening of January 1, 1997, she was standing in the hall talking with some of the nurses before going to visit her mother-in-law in her room. While the group was talking, Ms. Ray came out of a nearby patient's room and joined the conversation. At one point, Ms. Cox jokingly pointed her finger at Ms. Ray. Ms. Ray allegedly responded by grabbing Ms. Cox's finger and twisting her hand, bending the finger backwards. As she dug her fingernails into Ms. Cox's hand, she warned Ms. Cox never to point her finger in her face again. Ms. Cox testified that at the time of the trial, she still had scars on her hand from this incident.

Ms. Cox informed Shirley Price, the Director of Nursing, of Ms. Ray's outburst and harmful behavior. Ms. Price, in turn, reported the incident by filing a formal complaint with William Moore, the CMC Administrator. Included in the report were statements made by several of Ms. Ray's colleagues who described her as being "short with residents" and using a tone of voice that was "too harsh at times," indicating Ms. Ray's "illness, or lack of patience with residents." However, only after Ms. Ray had assaulted Ms. Limbaugh did Mr. Moore discipline the nursing assistant for her behavior towards Jennie Cox by placing her on probation for one year.

At the conclusion of a bench trial, the trial court determined that Ms. Ray was "an accident about to happen" and affirmatively found that CMC "had more than ample forewarning of the demeanor, conduct, attitude, belligerence and physical aggressiveness through the incident with Ms. Cox." Accordingly, the court awarded a judgment of $40,000 against CMC for its negligence. The court also found that Ms. Ray assaulted Ms. Limbaugh without justification, causing her to suffer severe injuries to her arm and face. The court awarded a judgment of $25,000 against Ms. Ray.

Both Mr. Limbaugh and CMC appealed the trial court's judgment.[3] The Court of Appeals determined that the weight of the evidence supports the trial court's finding that Ms. Limbaugh's injuries were caused by Ms. Ray's assault and battery, and therefore, it affirmed the trial court's $25,000 judgment against Louise Ray. However, the intermediate court reversed the trial court's judgment against CMC. The court found that CMC, a governmental entity,[4] is subject to the Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. §§ 29-20-101 to - 407 (1999), which waives governmental immunity from suit for any injury resulting from its tortious acts subject to the statutory exceptions specifically enumerated in its provisions. See Tenn. Code Ann. § 29-20-201(a).

---

[3] Specifically, both parties argued that the trial court improperly allocated fault among the negligent and intentional defendants. Mr. Limbaugh asserted that the trial court erred in not holding the nursing home liable for the entire amount of damages. In the alternative, CMC argued that it was immune from suit under the Governmental Tort Liability Act, and consequently, it should not have been allocated fault for the intentional torts of one of its employees.

Notably, Ms. Ray did not file a notice that she was appealing the trial court's judgment against her. However, because both Mr. Limbaugh and CMC filed notices of appeal, Ms. Ray was not required to file a separate notice pursuant to Rule 13(a), which states that "once any party files a notice of appeal the appellate court may consider the case as a whole." Tenn. R. App. P. 13(a) Advisory Commission Comment.

[4] The parties stipulated that CMC is a governmental entity as defined in Tennessee Code Annotated § 29-20-102(3).

Indeed, the Court of Appeals applied one of these exceptions, section 29-20-205, which expressly waives immunity for injuries proximately caused by a negligent act or omission of a governmental employee. However, the court cited this Court's decision in Potter v. City of Chattanooga, 556 S.W.2d 543 (Tenn. 1977), to conclude that while CMC was in fact negligent, the nursing home is nevertheless immune from suit pursuant to subsection (2) of this provision, which retains the entity's immunity if the injuries at issue "arise out of" the intentional conduct of a governmental employee.

Mr. Limbaugh sought permission to appeal, which we granted,[5] presenting two issues for our review: (1) whether a governmental entity's negligence can provide the basis for liability under the GTLA for injuries arising out of a reasonably foreseeable assault and battery by an employee of that entity; and (2) whether comparative fault principles should apply when the negligent and intentional tortfeasors are both made parties to the suit.[6]

## STANDARD OF REVIEW

Our review of the trial court's findings of fact in this case is *de novo* upon the record of the trial court accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. See Tenn. R. App. P. 13(d); Cross v. City of Memphis, 20 S.W.3d 642, 644-45 (Tenn. 2000) (upholding Rule 13(d) as the applicable standard of appellate review for findings of fact in a bench trial).

## I. LIABILITY OF COFFEE MEDICAL CENTER,
## A GOVERNMENTAL ENTITY,
## UNDER THE GOVERNMENTAL TORT LIABILITY ACT

In 1973, the General Assembly enacted the Tennessee Governmental Tort Liability Act (GTLA) to codify the general common law rule that "all governmental entities shall be immune from

---

[5] Oral argument was heard on June 13, 2001, in Nashville. Although then Chief Justice Anderson was unavoidably absent from the argument, the parties were informed in open court of his participation in the discussion and in the decision of this case pursuant to Rule 1(a)(ii) of the Internal Operating Procedures of the Tennessee Supreme Court:

> Absent exceptional circumstances, all members of this Court shall participate in the hearing and determination of all cases unless disqualified for conflicts. However, a hearing shall proceed as scheduled notwithstanding the unavoidable absence of one or more justices. Any justice who is unavoidably absent from the hearing may participate in the determination of the case either by teleconferencing, videoconferencing, or by reviewing the tape of oral argument, subject to the determination of the Chief Justice. Counsel shall be advised in open court that the absent justice will fully participate in the discussion and decision of the case.

[6] The Court of Appeals declined to directly address this issue, stating that its reversal of the trial court's judgment against CMC rendered this issue moot as to the medical center. However, by affirming the $25,000 judgment against Ms. Ray, the Court of Appeals implicitly upheld the trial court's apportionment of fault between the negligent and intentional tortfeasors.

suit for any injury which may result from the activities of such governmental entities," Tenn. Code Ann. § 29-20-201(a), subject to statutory exceptions in the Act's provisions. For instance, a general waiver of immunity from suit for personal injury claims is provided in section 29-20-205 "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment," unless the injury arises out of one of several enumerated exceptions to this section, such as the intentional tort exception. Specifically, this exception bars claims for injuries arising out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." Tenn. Code Ann. § 29-20-205(2). At issue in this case, then, is whether the plaintiff's claim against CMC to recover for injuries arising out of the nursing assistant's assault and battery is barred by the intentional tort exception that potentially immunizes CMC from liability.

### *Negligence of Coffee Medical Center*

Although the parties have not raised the issue of whether a nursing home is under "an affirmative duty to act to prevent [its residents] from sustaining harm," Bradshaw v. Daniel, 854 S.W.2d 865, 871 (Tenn. 1993), we have held that where a special relationship exists between the defendant and "a person who is foreseeably at risk from . . . danger," id. (citing *Restatement (Second) of Torts* § 315 (1965)), the defendant is under an affirmative duty to take "whatever steps are reasonably necessary and available to protect an intended or potential victim." Turner v. Jordan, 957 S.W.2d 815, 819 (Tenn. 1997) (quoting Naidu v. Laird, 539 A.2d 1064, 1075 (Del. 1988)). An example of this special relationship, and one most analogous to the relationship at issue in this case, is the physician/patient relationship born out of the physician's assumption of responsibility for the care and safety of another. See, e.g., Turner, 957 S.W.2d at 820-21 (holding that a psychotherapist has an affirmative duty to protect a foreseeable third party when the patient presents an unreasonable risk of danger to that party); Bradshaw, 854 S.W.2d at 872 (holding that a physician owes a duty to warn identifiable persons in the patient's family against foreseeable risks related to the patient's illness); Wharton Transport Corp. v. Bridges, 606 S.W.2d 521, 526 (Tenn. 1980) (holding that a physician owed a duty to a third party injured by a truck driver whom the physician had negligently examined and certified). It follows, then, that the relationship between a nursing home and its residents, where a nursing home voluntarily assumes an obligation to "'provide care for those who are unable because of physical or mental impairment to provide care for themselves,'" Niece v. Elmview Group Home, 929 P.2d 420, 424 (Wash. 1997) (alteration in original) (citations omitted), gives rise to an affirmative duty owed by the nursing home to exercise reasonable care to protect its residents from all foreseeable harms "within the general field of danger which should have been anticipated." Id. at 427.

In this case, the evidence clearly reflects that the risk of harm to Ms. Limbaugh was a foreseeable one. First, several members of the nursing home staff had witnessed, just eighteen days prior to the incident with Ms. Limbaugh, Ms. Ray's physical outburst directed at visitor Jennie Cox. Second, Ms. Limbaugh herself was well known by the nursing staff to physically strike out against her caretakers as a result of her dementia. Consequently, it was certainly foreseeable that this

nursing assistant, who had demonstrated her propensity to be physically aggressive even when slightly provoked, presented a risk of harm to a resident also known to be combative. In addition, evidence was presented by Mr. William Moore, the administrator of the nursing home during Ms. Ray's employment, as to the nursing home's standard procedure for dealing with the errant behavior of an employee. He testified that "if there was any contact between any associate, [who] is an employee of the facility, that is combative in any manner whatsoever, it would be reported directly to the [S]tate within 24 hours, written up, and sent in. That employee would be sent home and placed on leave." He further testified that he would discharge any employee who had "physically assaulted, battered, [or] touched" another person, or who otherwise had demonstrated a propensity for violence. We believe that CMC's policy for disciplining a combative employee, although not followed in this case, further demonstrates that physical abuse by staff members previously known to be physically aggressive is a foreseeable danger against which reasonable precautions must be taken.

Obviously, "[t]here is . . . no liability when such care has in fact been used, nor where the defendant neither knows nor has reason to foresee the danger or otherwise to know that precautions are called for." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 56, at 385. However, this was not the case. The record indicates that on January 2, 1997, the day after the incident between Louise Ray and Jennie Cox, the Director of Nursing filed a Record of Complaint reporting Ms. Ray's harmful behavior, which was submitted to Mr. Moore. However, the only evidence in the record regarding Mr. Moore's acknowledgment of this incident with Ms. Cox is a memorandum signed by Mr. Moore and dated January 22, 1997. In this memorandum, Mr. Moore explained that he discussed this incident with Ms. Ray and put her on probation for one year "from the date of this discussion." Although this date is never specified, the record reflects that Ms. Ray was working scheduled shifts until the date of the incident involving Ms. Limbaugh. As the trial court found,

> [T]he defendant nursing home had more than ample forewarning of the demeanor, conduct, attitude, belligerence and physical aggressiveness through the incident with Ms. Cox and the fitness reports . . . . It is clear[] Ms. Ray was an accident about to happen. The records are barren of any attempts at intervention prior to the Limbaugh assault.
>
> I find affirmatively the inaction of the nursing home and the lack of corrective action involving this employee, Ms. Ray, was the direct and proximate legal cause of the injury sustained by [Ms. Limbaugh].

We affirm the trial court's decision and hold that CMC did indeed act negligently in failing to take reasonable precautions to protect Emma Ruth Limbaugh from the foreseeable risk that she would be assaulted by a staff member known to be physically aggressive.

### *Intentional Tort Exception*

Having determined that CMC was indeed negligent in failing to take affirmative action to protect Ms. Limbaugh from the foreseeable risk that she would be harmed by Ms. Ray, CMC is potentially subject to liability pursuant to section 29-20-205 of the GTLA. However, the issue here is whether CMC nonetheless retains its immunity pursuant to the intentional tort exception to this provision, which immunizes the governmental entity from tort liability if the injury arises out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights." The intermediate court cited our decision in Potter v. City of Chattanooga, 556 S.W.2d 543 (Tenn. 1977), to hold, albeit reluctantly, that CMC retains its immunity because Ms. Ray

> committed an intentional tort, assault and battery [sic], upon Emma Ruth Limbaugh. Inasmuch as the GTLA does not permit a plaintiff to recover for the intentional torts of governmental employees, and inasmuch as our supreme court's decision in Potter does not permit a plaintiff to circumvent the defense of governmental immunity by asserting a claim for negligent hiring or retention, we conclude that the judgment entered against the Medical Center in this case must be reversed.

Because our decision today overrules Potter to the extent that it retains immunity from liability for those torts *not specifically enumerated in the intentional tort exception*, we reverse the intermediate court and hold that CMC is liable for the intentional assault and battery committed by the nursing assistant.

The factual background in Potter involved the plaintiff's arrest by a City of Chattanooga police officer who discovered a bottle of alcohol in the plaintiff's vehicle. Although the officer did not test the plaintiff to determine whether she was intoxicated, he nevertheless arrested her for public drunkenness. At the city jail, the officer became irate when she started to cry, whereupon he physically assaulted the plaintiff in her cell, causing her to suffer severe injuries including broken bones and bleeding in her ear. Id. at 544.

The plaintiff filed suit against the city for the intentional torts of false arrest and battery. In response to the city's motion to dismiss, the plaintiff amended her complaint to allege that the city was negligent in failing to "screen[] its employees to adequately determine the psychological capabilities of its employees to handle the jobs to which they were assigned"; consequently, such negligence failed to protect her from the police officer's "berzerk and callous" actions, which the city "should have known or reasonably could have known were likely to [occur]." Id. We dismissed the action against the city, holding that

> the true bases of the injuries for which recovery of damages is sought are false arrest and assault and battery. The amendment to the complaint, while levelling additional charges of negligence against the City, does not alter the fact that the injuries that are the subject of the action "arose out of" the battery and the false arrest, and was not effective to avoid the immunity granted the City under [Tennessee Code Annotated

section] 23-3311.

Id. at 545.

Notably, our decision relied in part on two factually similar cases outside this jurisdiction that addressed the same issue and that ultimately reached the same results. However, as the respective tort liability statutes were worded differently, those two decisions should have had little impact in our jurisdiction. First, we cited Salerno v. Racine, 214 N.W.2d 446 (Wis. 1974), where the plaintiff sued the city for the intentional torts committed by a police officer and for the city's negligence in retaining that violent officer. The Wisconsin Supreme Court, applying the applicable statute, found the city to be immune from suit on all counts. The statute at issue in that case provided in pertinent part: "No suit shall be brought against any [governmental entity] for the intentional torts of its [employees] nor shall any suit be brought against [governmental entities] or against [their] employees] for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Id. at 447 n.1. Although the statutory language plainly protected the city from suit for the officer's intentional assault and battery, the statute was unclear as to whether a governmental entity could be liable for its negligence. Accordingly, the Wisconsin Supreme Court was able to avoid addressing the issue of the city's negligence by deciding instead that the officer's retention was a quasi-judicial function and the city was therefore immune under the statute. Consequently, the Salerno decision does not provide adequate guidance for determining whether a Tennessee governmental entity should be held liable for negligently allowing an employee to intentionally proximately cause the plaintiff's injuries.

We also relied on the decision in Little v. Schafer, 319 F. Supp. 190 (S.D. Tex. 1970), which interpreted the Texas Tort Claims Act containing statutory language similar to that in the GTLA but expressly listing assault and battery in its provision preserving a municipality's immunity. In Little, the district court rejected the plaintiff's claim that two Texas cities negligently entrusted its police officers with night clubs. The court relied on the plain language in the Texas Act, which excluded a municipality from liability for "[a]ny claim arising out of assault, battery, false imprisonment, or any other intentional tort." Id. at 191. The court reasoned that "a citizen's complaint about the negligent utilization of police officers has no meaning apart from those officers' acts or omissions which inure to the detriment of the complainant. The assault is the sine qua non of plaintiff's knowledge that municipal negligence exists." Id. at 192. While we continue to agree with that rationale,[7] our statute does not allow us to reach this precise result if the intentional torts committed

---

[7] Justice Holder, in her concurring opinion, disagrees with the majority on this point and would hold instead that Potter should be overruled in its entirety. She argues that a governmental entity should be held liable "for its negligent employment practices regardless of the nature of the underlying acts of the employee causing the injury." We respectfully disagree with this interpretation of the statute. We re-emphasize that the General Assembly enacted Tennessee's GTLA to codify the general common law rule that "all governmental entities shall be immune from suit," Tenn. Code Ann. § 29-20-201(a), subject to the specific exceptions contained within the Act. One such exception is provided in section 29-20-205, which waives immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment." If this general waiver ended here, Justice Holder's position

(continued...)

are not enumerated in the intentional tort exception.

As a result of Potter's overbroad application of the intentional tort exception, courts following Potter have subsequently, albeit erroneously, held that the intentional tort exception preserves immunity for injuries arising from *all* intentional torts. See, e.g., Jenkins v. Loudon County, 736 S.W.2d 603, 608 (Tenn. 1987) (stating that the "scope of the GTLA is generally intended to exclude intentional torts"); Belk v. Obion County, 7 S.W.3d 34, 40 (Tenn. Ct. App. 1999) (stating that "neither intentional torts nor violations of civil rights" give rise to liability of county and municipal governments); Roberts v. Blount Mem'l Hosp., 963 S.W.2d 744, 746 (Tenn. Ct. App. 1997) (stating that it is "well-settled that the Governmental Tort Liability Act has no application to intentional torts"); Gifford v. City of Gatlinburg, 900 S.W.2d 293, 296 (Tenn. Ct. App. 1995) ("[T]here is no waiver of immunity under the [GTLA] for intentional tort."); Anderson v. Hayes, 578 S.W.2d 945, 949 (Tenn. Ct. App. 1978) (stating that "it is logical to conclude that [section 29-20-205(2)] shows an obvious legislative intention to exclude only [i]ntentional tort cases"). While this principle is *generally* accurate, we notice that conspicuously absent from the list of intentional torts in subsection (2) are those of assault and battery.

It is well-settled that the role of this Court in construing statutes is "to ascertain and give effect to" the legislative purpose and intent without unduly restricting or expanding a statute's coverage beyond its intended scope. Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000). "'The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application.'" Id. (quoting State v. Blackstock, 19 S.W.3d 200, 210 (Tenn. 2000)). Courts are not authorized to alter or amend a statute, and must "'presume that the legislature says in a statute what it means and means in a statute what it says there.'" Id. at 307 (quoting BellSouth Telecomm., Inc. v. Greer, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)); Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 803 (Tenn. 2000) ("'If the words of a statute plainly mean one thing they cannot be given another meaning by judicial construction.'" (quoting Henry v. White, 250 S.W.2d 70, 72 (Tenn. 1952)). This last principle applies especially when analyzing the GTLA, as the legislature created this Act in derogation of the common law, and therefore, the Act must be strictly construed. Roberts, 963 S.W.2d at 746 (citing Lockhart ex rel. Lockhart v. Jackson-Madison County Gen. Hosp., 793 S.W.2d 943 (Tenn. Ct. App. 1990)).

Applying the foregoing principles of statutory construction, we conclude that it was error to expand the intentional torts exception to include the torts of assault and battery. The legislative

---

[7] (...continued)
would be more persuasive to us. However, the provision goes on to exempt from liability those injuries "arising out of" one of several enumerated exceptions to this section, including the intentional tort exception. As this Act was created in derogation of the common law, it must be strictly construed. Roberts, 963 S.W.2d at 746. Therefore, we decline to impose blanket liability on a governmental entity for its negligent employment practices when one of the exceptions immunizing the entity is applicable.

intent has been expressed in plain and unambiguous terms, and we are therefore required to enforce the statute as written. The General Assembly expressly created section 29-20-205 to remove governmental immunity for injuries proximately caused by negligent acts; that it wanted to then create several exceptions to this general waiver convinces us that additional exceptions are not to be implied absent legislative intent to the contrary. Cf. United States v. Smith, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

Accordingly, we hold that section 29-20-205 of the GTLA removes immunity for injuries proximately caused by the negligent act or omission of a governmental employee except when the injury arises out of *only those specified torts enumerated in subsection (2)*. To immunize *all* intentional torts would result in an overly broad interpretation of the statute, and there is no indication that the legislature intended such a result. Indeed, we find it noteworthy that the legislature excluded the two intentional torts most likely to give rise to injury. Under the maxim "*expressio unius est exclusio alterius*," which states the principle that the expression of one thing implies the exclusion of all things not expressly mentioned, City of Knoxville v. Brown, 260 S.W.2d 264, 268 (Tenn. 1953), we are unable to expand the intentional torts exception to include assault and battery. To do so would be to judicially create two additional exceptions giving rise to an entity's immunity.[8] To the extent that Potter and other cases hold otherwise, they are overruled.

Applying our conclusions to the present case, we first reiterate that Ms. Ray's assault of Ms. Limbaugh was a foreseeable consequence of CMC's failure to take reasonable precautions to protect its residents from the risk of abuse by this aggressive nursing assistant. Based on the plain language of section 29-20-205, the injury inflicted on Ms. Limbaugh was "proximately caused by a negligent act or omission" of this nursing home's supervisory personnel. Although it is that negligence of which the plaintiff complains, it is clear that Ms. Limbaugh's injuries "arose out of" the intentional torts of assault and battery committed by Ms. Ray. Because these torts are conspicuously absent from the intentional tort exception rendering governmental entities immune from liability for injuries, we hold that the clearly negligent defendant is not immune under this exception.

### *The Discretionary Function Exception to Liability for Negligence Under the Governmental Tort Liability Act*

---

[8] Moreover, when we compare similarly worded statutes outside our jurisdiction, we observe that the torts of assault and battery are specifically included in the exceptions to the removal of immunity. For example, the Federal Tort Claims Act, which waives the government's historic sovereign immunity, allows recovery against the United States for the negligent acts of any of its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (1994). However, this waiver of immunity does not apply to "[a]ny claim arising out of assault, battery," or other enumerated intentional torts. 28 U.S.C. § 2680(h). Similarly, the Utah Governmental Immunity Act, which is phrased almost identically to the Tennessee Act, also has a provision barring recovery for claims arising out of "assault [or] battery" and other specifically enumerated intentional torts. See Utah Code Ann. § 63-30-10(2).

We next address whether CMC is nevertheless immune from tort liability under section 29-20-205(1), the discretionary function exception. This exception immunizes local governmental entities from liability for an employee's negligence if the injury arises out of "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Essentially, the discretionary function exception prevents the use of tort actions to second-guess what are essentially legislative or administrative decisions involving social, political, economic, scientific, or professional policies or some mixture of these policies. Doe v. Coffee County Bd. of Educ., 852 S.W.2d 899, 907 (Tenn. Ct. App. 1992) (citing United States v. Gaubert, 499 U.S. 315, 323 (1991)). The rationale for preserving immunity for certain acts performed by governmental entities is that the government should be permitted to operate without undue interference by the courts, as courts are often "ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision." Bowers v. City of Chattanooga, 826 S.W.2d 427, 431 (Tenn. 1992) (quoting Wainscott v. State, 642 P.2d 1355, 1356 (Alaska 1982)); see also Carlson v. State, 598 P.2d 969, 972 (Alaska 1979).

In Bowers v. City of Chattanooga, this Court recognized that a more precise method of analysis was needed for determining which acts are entitled to discretionary function immunity. Consequently, we adopted the planning-operational test under which it is the "nature of the conduct," that is, the decision-making process, and not the "status of the actor," Bowers, 826 S.W.2d at 430-31, that governs whether the exception applies. See also United States v. Gaubert, 499 U.S. 315, 322 (1991). Under this analysis, a planning decision is most likely to reflect a course of conduct that was determined after consideration or debate by those in charge of formulating plans or policies. Bowers, 826 S.W.2d at 430 (citing Carlson, 598 P.2d at 972-73). Decisions that rise to the level of planning or policy-making are considered to be discretionary acts requiring judicial restraint and are, therefore, not subject to tort liability. On the other hand, decisions that merely implement pre-existing policies and regulations are considered to be operational in nature and require the decision-maker to act reasonably in implementing the established policy. If the policy, regulation, or other standard of procedure mandates specific conduct, then any employee reasonably complying with that direction will not abrogate the entity's immunity if the action furthers the underlying policies of the regulation. See generally Chase v. City of Memphis, 971 S.W.2d 380, 384 (Tenn. 1998). If such an employee does not act reasonably but pursues a course of conduct that violates mandatory regulation, the discretionary function exception will not apply because the action would be contrary to the entity's established policy. Id.; see also Gaubert, 499 U.S. at 324.

Turning to the facts in this case, the administrator of the nursing home at the time of Ms. Limbaugh's abuse testified as to the existence of certain standards for disciplining an employee who has exhibited combative behavior. According to Mr. Moore's testimony, these standards required that the incident be reported to the State within twenty-four hours of its occurrence and that the offending employee be sent home and "placed on leave," presumably also within that twenty-four hour period to await the State's investigation. Applying the foregoing principles, we find that the nursing home's broad discretion to implement a policy governing the questions of whether and how to discipline combative employees is indeed a policy determination that cannot give rise to tort liability. However, CMC negligently failed to follow the guidelines designed to prescribe the proper

-11-

disciplinary measures to impose upon Ms. Ray after the incident involving Jennie Cox. Accordingly, the discretionary function exception to the waiver of governmental immunity does not bar recovery for Mr. Limbaugh's claims against the negligent nursing home. Therefore, we reverse the judgment of the intermediate court and hold that CMC is liable for Ms. Limbaugh's injuries proximately caused by its negligent acts.

## II. APPORTIONMENT OF FAULT

The final issue presented for our review is whether the trial court erred in apportioning fault between the negligent and intentional defendants where the intentional conduct was the foreseeable risk created by the negligent nursing home.[9] This question is one of first impression and requires us to review our holding in Turner v. Jordan, 957 S.W.2d 815 (Tenn. 1997).

In Turner, the plaintiff, a hospital nurse, was assaulted and severely injured by Tarry Williams, a mentally ill patient in the hospital where she worked. Dr. Jordan, Williams's treating psychiatrist, had diagnosed his patient as "aggressive, grandiose, intimidating, combative, and dangerous," id. at 817 (emphasis omitted), but he nevertheless decided to discharge him from the hospital by "allowing him to sign out AMA [Against Medical Advice]." Id. (alteration in original). After her attack, the plaintiff brought suit against Dr. Jordan, alleging that he violated his duty to use reasonable care in the treatment of his patient, which proximately caused her injuries and resulting damages. After determining that the psychiatrist did indeed owe a duty of care to the plaintiff nurse because he knew or should have known that his patient posed "an unreasonable risk of harm to a foreseeable, readily identifiable third person," id. at 821, we then held that the "conduct of a negligent defendant should not be compared with the intentional conduct of another in determining comparative fault where the intentional conduct is the foreseeable risk created by the negligent tortfeasor." Id. at 823.

We held the defendant responsible for the entire amount of the plaintiff's damages for several reasons. First, we determined that the legal conception of "fault" necessarily precluded the allocation of fault between negligent and intentional actors because "negligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of each act." Id.[10]

---

[9] Interestingly, the issue of Ms. Ray's immunity from suit for her tortious actions committed as a governmental employee has not been raised in the trial court, the Court of Appeals, or in this Court. Therefore, any claims for Ms. Ray's immunity made pursuant to Tennessee Code Annotated § 29-20-310(b) ("No claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental entity is removed by this chapter unless the claim is one for medical malpractice brought against a health care practitioner. . . .") have been waived.

[10] As aptly expressed by the dissenting opinion in a case decided by the Wyoming Supreme Court,

The law of intentional torts constitutes a separate world of legal culpability. It is a system that balances specific rights and obligations, and imposes liability on the basis of a party's intent, rather

(continued...)

Second, we expressed our concern that allowing comparison would reduce the negligent person's incentive to comply with the applicable duty of care and thus prevent further wrongdoing. Id. Finally, we recognized that when a defendant breaches a duty to prevent the foreseeable risk of harm by a nonparty intentional actor, that negligent co-tortfeasor cannot reduce his or her liability by relying on the foreseeable risk of harm that he or she had a duty to prevent. Id.

The present case presents a different factual setting. Unlike Turner, the plaintiff here has brought a cause of action against all tortfeasors whose unreasonable acts have contributed to the elderly resident's injuries. Consequently, we are required to determine how to assign causal responsibility between negligent and intentionally tortious defendants where the intentional misconduct is the foreseeable risk created by the negligent defendant. We continue to adhere to the principle established in Turner that the conduct of a negligent defendant should not be compared with the intentional conduct of a nonparty tortfeasor in apportioning fault where the intentional conduct is the foreseeable risk created by the negligent tortfeasor. Id.; see also White v. Lawrence, 975 S.W.2d 525, 531 (Tenn. 1998) (holding that the defendant physician's liability would not be reduced by comparing his negligent conduct with the decedent's intentional act of committing suicide since the intentional act was a foreseeable risk created by the defendant's negligence). After careful consideration, we conclude that where the intentional actor and the negligent actor are both named defendants and each are found to be responsible for the plaintiff's injuries, then each defendant will be jointly and severally responsible for the plaintiff's total damages. See generally *Restatement (Third) of Torts* § 24 (1999). Therefore, both CMC and Ms. Ray are each liable for all of the plaintiff's damages.[11]

Although our adoption of comparative fault abrogated the use of the doctrine of joint and several liability in those cases where the defendants are charged with separate, independent acts of negligence, see McIntyre v. Balentine, 833 S.W.2d 52, 58 (Tenn. 1992), the doctrine continues to be an integral part of the law in certain limited instances. See Owens v. Truckstops of Am., 915 S.W.2d 420, 431 n.13, 432 (applying joint and several liability to parties in the chain of distribution of a product when the theory of recovery is strict liability); see also Resolution Trust Corp. v. Block, 924 S.W.2d 354, 355-56 (Tenn. 1996) (holding the officer and director jointly and severally liable

---

[10] (...continued)
than the moral blameworthiness of that party's conduct by societal standards. The real qualitative distinctions between intentional torts and other forms of culpable conduct share a single origin–the "duty" concept. Intentional torts are dignitary by nature. They are designed to protect one's right to be free from unpermitted intentional invasions of person or property. Alternatively, the duty underlying an action in negligence or strict products liability is to avoid causing, be it by conduct or by product, an unreasonable risk of harm to others within the range of proximate cause foreseeability. These distinct worlds of culpability cannot be reconciled.

Mills v. Reynolds, 807 P.2d 383, 403 (Wyo. 1991) (Urbigkit, C.J., dissenting).

[11] Although statutory principles of contribution and indemnity apply, there is "no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury." Tenn. Code Ann. § 29-11-102(c).

to the corporation for their collective actions). We believe that in the context of a negligent defendant failing to prevent foreseeable intentional conduct, the joint liability rule "is a very reasonable and just rule of law which compels each to assume and bear the responsibility of the misconduct of all." Resolution Trust Corp., 924 S.W.2d at 356. Consequently, we reverse the trial court's apportionment of fault and hold that CMC and Louise Ray are jointly and severally liable for the full amount of damages awarded to Mr. Limbaugh. However, because the trial court incorrectly apportioned damages between the two tortfeasors, we remand this case to the Circuit Court for Coffee County to determine the total amount of damages for which each tortfeasor shall be jointly and severally liable.

### CONCLUSION

Having thoroughly examined the record in this case and after carefully applying all applicable law, we hold that: (1) the Governmental Tort Liability Act removes governmental immunity for injuries proximately caused by the negligent act or omission of a governmental employee except when the injury arises out of only those specified torts enumerated in Tennessee Code Annotated section 29-20-205(2); and (2) where the harm arising from the tortious acts of an intentional tortfeasor was a foreseeable risk created by a negligent defendant, and all tortfeasors have been made parties to the suit, each tortious actor shall be jointly and severally liable for the plaintiff's damages.

Accordingly, we affirm that portion of the judgment of the Court of Appeals finding Coffee Medical Center negligent. However, we reverse those portions of the judgment (1) holding Coffee Medical Center immune from suit, and (2) implicitly upholding the trial court's apportionment of fault and allocation of damages between the negligent and intentional tortfeasors. We remand the case to the trial court to determine the total amount of damages to be awarded to the plaintiff.

Costs of this appeal are taxed to the appellee, Coffee Medical Center.

_____
WILLIAM M. BARKER, JUSTICE